## The Pennsylvania Railroad Co. *versus* Hughes.

*Title necessary to sustain Action of Trover.—Notice of Claim immaterial, where Title of Claimant is defective.*

1. H. bought ten tons of railroad iron, upon a siding of the old Portage road over the Alleghenies, from the vendees of the state, for which he paid, and received a receipt and a written order on the state agent for the delivery of the iron, but never presented it, and, in consequence, the iron purchased was not separated and set apart from a larger quantity of railroad iron with which it was mixed. The Pennsylvania Railroad Company afterwards bought and removed the whole amount of the iron. In an action of trover and conversion, brought by H. against the company, for the iron purchased by him, it was *held*, that, from the failure of the plaintiff to present the order and have the amount bought severed and distinguished from the mass, the sale was incomplete, and did not pass any such title to him as would ground an action of trover and conversion to recover the value of the iron.

2. Where the plaintiff failed to show title in himself for the iron sued for, it is immaterial whether or not there was evidence that the railroad company had notice of his rights, before their purchase: for if he had no title, the company could not be affected by notice of his claim.

ERROR to the Common Pleas of *Blair county*.

This was an action of trover, brought to July Term 1858, by Charles Hughes against the Pennsylvania Railroad Company.

The facts of the case were these :—

On the 31st August 1854, the Commonwealth of Pennsylvania entered into a contract with the Cambria Iron Company for a supply of rails to lay the track of the New Portage Railroad, stipulating for the delivery of the new rails at the west end of the Portage Railroad, and selling the old rails to them "to be delivered to the company at the same point where they deliver new rails." On the 18th July 1855, the Cambria Iron Company assigned the contract to Wood, Morrell & Co., who were then carrying on the Cambria Iron Works at Johnstown. Charles Hughes, the plaintiff, was manufacturing fire-brick near Plane No. 8, on the Old Portage Railroad, and had his works connected with the old track by a siding, put down with iron belonging to the Commonwealth, for which he had obtained the consent of the superintendent of the road. This old track connected his works with the new when it was laid. Some time in 1856 Mr. Hughes applied to the canal commissioners for the old iron from the foot of Plane No. 8 to where the Old Portage Road intersected the new. General Callahan, the superintendent of the road, in company with Hughes, measured the track, and found that there were between 70 and 80 tons of iron upon that part which Hughes proposed to purchase. Callahan, by direction of the canal commissioners, informed Hughes that they could not sell to him; that the old iron had been sold to the Cambria Iron Company, and that if he wished to buy he must apply to Wood,

[Pennsylvania Railroad Co. *v.* Hughes.]

Morrell & Co. Hughes went to Morrell in September 1856, and offered to buy *that part of the old road between his works and the new road.* Morrell told him he could not give him an order for any special portion of the track; that the iron did not belong to them until it was delivered; but he would give him an order on Callahan for 10 tons, which he might deliver to him whenever he saw proper. Hughes thereupon paid $500, and Morrell gave him an order on the 2d September 1856, to General Callahan for 10 tons of " Old Portage Railroad iron, of the same now lying upon the old road between the factory of Mr. Hughes, at or near Plane 8 and the intersection of the new Allegheny Portage Railroad, the weight to be estimated by General W. S. Callahan, and the estimate returned to us ;" telling him that he must present the order to General Callahan.

With this order there was the following bill and receipt :—

Hollidaysburg, September 2d, 1856.

Mr. Chas. Hughes

Bought of Wood, Morrell & Co.

10 tons of Old Portage Railroad iron, at $50 per ton, $500.

Received payment,

Wood, Morrell & Co.

The order never was presented, nor was any measurement or estimate of the iron ever made by General Callahan, or by any other officer of the Commonwealth, nor did Hughes ever inform Callahan that he had the order, or request an estimate to be made of it.

Mr. Morrell settled with Mr. Gay, on part of the Commonwealth, for 10 tons, allowing a credit for $500, " after the works had all passed to the Pennsylvania Railroad Company."

The track remained undisturbed, and was in the same condition at the time the public works were sold to the Pennsylvania Railroad Company as when Hughes received his order. It was agreed upon the trial that a deed had been executed and delivered to the Pennsylvania Railroad Company for the public works, in pursuance of the Act of 16th May 1857. After the railroad company became the owner of the public works, they took up the track of the Old Portage Railroad, and included in it the track between Mr. Hughes's brick-yard and the New Portage Railroad. Mr. Hughes claimed to have purchased the whole of this track, and brought this action of trover to recover the value of the whole of it, claiming some 70 or 80 tons of iron.

The defence was—

1. That the iron was not delivered to plaintiff according to the terms of the written order, and upon the terms contained in it. And,

2. That if his contract with Wood, Morrell & Co. had been

[Pennsylvania Railroad Co. v. Hughes.]

executed so as to vest in him the title to the ten tons, the defendant, who subsequently purchased from the Commonwealth without any knowledge of the transaction, occupies the position of a subsequent *bonâ fide* purchaser without notice.

The court below (TAYLOR, P. J.), after stating the main facts, charged the jury as follows :—

" It is quite clear, we think, that the plaintiff acquired and had, no right whatever to one pound of the iron beyond the specific quantity which he bought and paid for. It was all, even that upon the siding, the property of the Commonwealth. It is not claimed that any one had undertaken, with or without authority, to sell to the plaintiff the iron on the siding, or that he had bought it. His use of it for a purpose connected with the use of the road, though permitted by the agents of the Commonwealth, gave him no title to it; and, although such use or possession of it might avail him in trover against a mere *wrongdoer*, the defendant does not occupy that position, having succeeded to the rights of the Commonwealth by purchase. He bought only the specific quantity of 10 tons, lying on the track of the old Portage. The only question is, can he recover for that quantity? For that amount, his claim is not without merit, though it has to struggle against the rules of law interposed by the defence. That quantity he paid for, and Wood, Morrell & Co. accounted for it to the Commonwealth.

[Against the plaintiff's claim for the ten tons, however, it is urged:

" 1. That his contract with Wood, Morrell & Co. was not executed by a delivery of the iron, and that he acquired no title by the contract. We think, however, that since the plaintiff wanted to use the iron where it was, he and Wood, Morrell & Co., as between themselves, might waive the delivery according to the strict terms of the contract of the latter with the Commonwealth, and may be regarded as having done so; and that the transaction as between him and them and the Commonwealth, gave him title to the quantity of iron purchased.]

" 2. It is further objected that, whether he acquired title to the 10 tons, as against Wood, Morrell & Co., or the Commonwealth or not, the defendant is a subsequent *bonâ fide* purchaser without notice, and therefore protected.

" The defendant, in this respect, undoubtedly occupies the position of any other purchaser ; and, if there was not a delivery of this iron, in the absence of evidence of notice to the defendant of his purchase, his claim, on this ground, must fail. If, as he wanted to use the iron where it was, and did use it where it was, he had purchased all that he continued so to use in connection with his works, it might fairly be contended that it was such a delivery as, under the circumstances, could reasonably be had,

and therefore sufficient; but this was not the case. It was a purchase of 10 tons out of a much larger quantity, used in the same way, and in no way distinguished. [It is claimed, however, that the sale of the iron on the Old Portage Road, by the Commonwealth, in part payment of the iron for the New Portage Road, was a public fact, evidenced by the minutes of the board of canal commissioners, and by documents in their office, and from which, together with the situation of the old road at the time, it may be inferred, in point of fact, that a party purchasing those public works would know, and did know, of these contracts. Whatever is sufficient to put a party upon this inquiry amounts to notice. We leave it to the jury to determine whether there is in the facts thus suggested, or in any other evidence bearing upon the intercourse and relations of the parties in this business, sufficient to satisfy them that the railroad company, at the date of their purchase, knew of the prior sale of this iron by the Commonwealth. If there is, he may recover for the 10 tons; if not, his claim wholly fails, and your verdict should be for the defendant.]

"To this charge and opinion of the court the counsel of the plaintiff and of the defendant excepted, and prayed that the same may be reduced to writing and filed on record, which was accordingly done, and bills of exception signed and sealed."

There was a verdict and judgment in favour of plaintiff for $575. Whereupon the defendants sued out this writ, assigning for error here that the court below erred in that portion of the charge which is enclosed in brackets.

*John Scott* and *L. W. Hall*, for plaintiff in error, argued: 1. That the defence of "no title in plaintiff" was properly made, under the pleadings in the cause: Sylvester *v.* Girard, 4 Rawle 189.

2. The contract as to the ten tons was imperfect, because plaintiff never presented his order for it, nor ever requested an estimate or measurement, nor ever informed the agent of the Commonwealth that he had such an order. No specific ten tons were ever separated by or for him from the seventy or eighty tons lying between the designated points: Muclow *v.* Mangles, 1 Taunt. 218; Woods *v.* Russell, 5 B. & A. 942; E. C. L. R. vol. 7; Austen *v.* Craven, 4 Taunt. 644; Reinhart *v.* Olwine, 5 W. & S. 157; Briggs *v.* Thompson, 9 Barr 338; Burns *v.* Cooper, 7 Casey 426; Farmers' Bank *v.* McKee, 2 Barr 318.

Even if the public acts referred to by the learned judge would have the effect of notice to the company at the time of purchase, they can have no other effect than to give notice of what is in them.

They give notice only of an agreement by the Commonwealth to deliver old iron to the Cambria Iron Company, at Johnstown, and an assignment by that company of their contract to Wood,

[Pennsylvania Railroad Co. v. Hughes.]

Morrell & Co. No one could be affected by these, with notice of a sale by Wood, Morrell & Co., of a part of the old iron not delivered, and requiring, in order to make it a sale at all, a change of all the terms of the public contracts. As long as iron remained upon the track, in possession of the Commonwealth, the presumption would be it belonged to the Commonwealth, had not been delivered at Johnstown, and any party setting up a claim to part of it, against a purchaser from the Commonwealth, should certainly be required to prove actual notice to such purchaser before the time of his purchase. There was no pretence that the defendant had such notice, and we aver it was error to submit the question.

*Samuel S. Blair*, for defendant in error.—In taking away the ten tons of iron which Hughes had bought and paid for, with that which they had purchased of the state, the railroad company were wrongdoers. All the iron on the old road had been set apart by the state for the purchase of new iron—was sold to Wood, Morrell & Co., was not held or used by the state as part of her new road, and did not pass to the company under their purchase. Hughes was in possession of a portion of it, which possession was sufficient to enable him to maintain trover.

But if not, the delivery was still sufficient. The general rule invoked by the plaintiff in error, is not denied where anything remains to be done by the seller, as between him and the purchaser; but where the seller has nothing more to do, but something remains to be done by some one having charge or custody of the goods, the property does pass: Jackson v. Anderson, 4 Taunt. 24; Tarling v. Baxter, 6 Barn. & C. 360; Whitehouse v. Frost, 12 East 613.

The opinion of the court was delivered, July 24th 1861, by

WOODWARD, J.—Hughes, the defendant in error, plaintiff below, brought this action of trover against the railroad company, to recover the value of a quantity of railroad iron taken from a portion of the Old Portage Road across the Alleghenies. The conversion of the iron in question by the servants of the company was admitted, and the controversy turned altogether upon the plaintiff's title. The court held very correctly that the plaintiff must show property in himself, and the right of possession at the time of the conversion; and that of the seventy or eighty tons of iron at the place designated in the evidence, the plaintiff had shown title to no more than ten tons, and that as both he and the company claimed under the Commonwealth, he by a prior and the company by a subsequent purchase, it was a question of fact for the jury whether the company was a purchaser without notice of the prior rights of the plaintiff.

The verdict for the plaintiff established the conclusion that the company bought with notice of whatever rights Hughes had acquired.

But two questions proper for our consideration can arise upon such a record, and they are both suggested by the assignments of error :—

1st. Had Hughes acquired a complete and perfect title to ten tons of the iron ?

2d. If he had, was there evidence fit to be submitted to the jury, that the company, when they purchased, had notice of Hughes's title ?

These questions cover the whole case. For if Hughes had not acquired title, no question of notice could exist to be referred to the jury. But if he had acquired title, the question of notice was properly submitted, if there was evidence from which the jury might reasonably infer it.

First, then, let us look into Hughes's title. The Old Portage Railroad was built and owned by the state. Hughes manufactured fire-brick near Plane No. 8, and had his works connected with the old track by a siding put down with iron which belonged to the Commonwealth. When the old road was about to be superseded by the new, Hughes applied to the canal commissioners to sell him the old iron from foot of Plane No. 8 to where the old road intersected the new. They directed the superintendent, General Callahan, to make an estimate of the quantity and value of the iron, but before any bargain was closed, Callahan informed Hughes, under instructions from the commissioners, that the iron had been sold to Wood, Morrell & Co. General Callahan said he thought there was between seventy and eighty tons altogether, about fifteen of which was of the new heavy iron.

On the 31st of August 1854, the Commonwealth had contracted in writing with the Cambria Iron Company for 3500 tons of rails for the new road, in part payment for which the Cambria Iron Company agreed to receive the old rails, spikes, and other wrought iron from the old road, at $50 the ton, to be "delivered at the western extremity of the Old Portage Road near Johnstown."

On the 18th of July 1855, the Cambria Iron Company leased their works, and assigned the above contract to Wood, Morrell & Co., which accounts for the officers of the Commonwealth referring Hughes to that firm. He accordingly applied to Morrell, in September 1856, to buy the iron on the siding, and bought and paid for ten tons. Morrell says, " The money was paid for ten tons : we did not sell him any more than ten tons. I gave him to understand that the iron was to be delivered to us by General Callahan, and I would give him an order on the superintendent for it. I don't think I told him when it was to

be delivered. I told him it did not belong to us until it was delivered to us. I told him I would not give him an order for any part of the track, but gave him an order for ten tons: told him that order would have to be presented to General Callahan."

The receipted bill for ten tons, dated September 2d 1856, was accompanied with the written order of Wood, Morrell & Co. on General Callahan, for the act of delivery. That was an act to be performed, under the circumstances of this case, with care, discrimination, and judgment, by a state officer, and, when done, was to be reported to them. It was never performed, was never asked to be performed, and was never reported.

Now, upon such a state of facts, the law is decisive against the plaintiff below. The very latest compiler, Bateman, in his work on commercial law, at sect. 252, states the result of the authorities to be, that, before the vendee can in any case sue the vendor upon breach of contract for not delivering the goods, or sue for the goods themselves, or even retain the possession of them when they have been delivered to him, he must have complied with all the conditions upon which it was agreed that the right of property should pass to him.

In Hutchinson v. Hunter, 7 Barr 140, there was a sale of 100 barrels of molasses in a cellar containing 125 barrels. The barrels bought were not separated or marked, nor were any particular barrels agreed on. It was held to be an incomplete sale, and, in delivering the opinion of this court, Judge Rogers went into a full and exhaustive discussion of the authorities, including the case of Whitehouse v. Frost, 12 East 614, on which the counsel of the plaintiff below placed so much reliance. That case was shown to have been overruled, and Blackburn on Contracts of Sale was quoted with approbation, where he says, " Till the parties are agreed as to the specific identical goods, the contract can be no more than a contract to supply goods answering a particular description; and, since the vendor would fulfil his part of the contract by furnishing any parcel of goods answering that description, and the purchaser could not object to them if they did answer that description, it is clear that there can be no intention to transfer the property in any particular lot of goods more than another, till it is ascertained which are the very goods sold."

So in Winslow, Lanier & Co. v. Leonard, 12 Harris 14, evidence that " we have this day sold W., L. & Co., 400 tons of pig metal, now at our landing, or that will soon be delivered there," was held to be, of itself, insufficient to prove a perfect sale of a specified lot of metal.

From these cases, and the numerous cases cited therein, it is apparent beyond all reasonable controversy, that by failing to present his order to Callahan, and to have his ten tons severed

[Pennsylvania Railroad Co. *v.* Hughes.]

and distinguished from the mass with which they were mixed, the plaintiff below failed to complete any such title in himself as would ground an action of trover and conversion. The court ought so to have instructed the jury. The facts upon this part of the case were few, and undisputed. There was no conflicting evidence on the point of delivery under Morrell's order. And, without that point well proved, the court ought to have told the jury the plaintiff had no case.

It is not necessary to discuss the question of notice. For, if there was evidence to affect the company with notice of the rights of Hughes, and Hughes had no title, the notice was nothing. If the company knew every fact which goes to make what title Hughes exhibited, and full notice can imply no more title than was proved, the question still would be whether these facts constitute a title in law. Clearly, they do not, and that seems to end the case.

For the same reason that the question of notice becomes unimportant, it is not necessary to discuss the purchase by the railroad company. Neither the state nor Wood, Morrell & Co. complain of the company for taking the iron, and Hughes, having no title to it, had no right to complain.

The judgment is reversed, and a *venire facias de novo* is awarded.